RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE  5 / 3 / 13

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | 1:95-CR-10016 |
| CONNIE LEWIS and PATSY LEWIS (Defendants), and Charlene Slater (Garnishee) | JUDGE DEE D. DRELL MAGISTRATE JUDGE JAMES D. KIRK |

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is an application for writ of execution filed by the government, pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(m)(1)(A)(i)-(ii), and the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001-3308 ("FDCPA"), against property titled in the name of Charlene Lewis Slater, for satisfaction of restitution ordered paid by her parents, Connie and Patsy Lewis, to the United States, pursuant to criminal convictions entered in the above-captioned case for food stamp fraud and engaging in monetary transactions with stolen money. The government is proceeding under the Mandatory Victims Restitution Act and the Federal Debt Collection Procedures Act.

At issue is whether the government can seize the property of Charlene Lewis Slater, the record title owner, on the allegation that Slater is merely the "nominee owner" for Patsy Lewis and the estate of Connie Lewis. While the government contends it is not attempting to revoke the sale as a fraudulent conveyance, it is

attempting to prove that funds acquired by Slater, from the sale of the property at 81 Pou Road (the property the government contends was given to her by Connie and Patsy Lewis), were used in part to acquire the property the government is presently attempting to seize (47 Ashton Road).  The government contends this evidence, together with the fact that Slater allows her parents, who live on a very limited fixed income, to live rent-free in her current property, show the Lewises are the actual owners of the current property (at 47 Ashton Road) and Slater is only the nominee owner.

Connie Lewis passed away during the pendency of this writ application and is no longer a party to this action.[1]  Pursuant to 28 U.S.C. 3203(d)(2), "The death of the judgment debtor after a writ of execution is issued stays the execution proceedings, but any lien acquired by levy of the writ shall be recognized and enforced by the court for the district in which the estate of the deceased is located.  The execution lien may be enforced (A) against the executor, administrator, or personal representative of the estate of the deceased; or (B) if there be none, against the deceased's property coming to the heirs or devisees or at their option against cash in their possession, but only to the extent of the value of the property coming to them."

This case has not been stayed because it is recommended that

---

[1] For convenience, this opinion refers to Connie Lewis in the present tense.

the government's writ of execution be denied.

The government's application for a writ of execution against Connie Lewis and Patsy Lewis, and against Charlene Slater's property at 47 Ashton Road in Boyce, Louisiana should be denied because it would violate the government's 1996 plea agreements with Connie and Patsy Lewis, and because the government has not proven that either Connie or Patsy Lewis has any ownership interest in Charlene Slater's property at 47 Ashton Road in Boyce, Louisiana.

<u>Procedural History</u>

Connie and Patsy Lewis, Carson Lewis, Jason Lewis, and Marion Richey were charged with multiple counts concerning a conspiracy to commit food stamp fraud in 1995 in the above-captioned case. Count 75 of the second superceding indictment listed several movable and immovable properties the government intended to seize, including a 4.09 acre tract of land at 81 Pou Road in Elmer, Louisiana (Doc. 72), even though Charlene Lewis (now Slater)(daughter of Connie and Patsy Lewis) was the record title-owner of the Pou Road property at that time.[2]

In the "Consent to Forfeiture" sections of the plea agreements confected by the government with Connie and Patsy Lewis (Doc. 84, para. 25; Doc. 89, para. 24), the government agreed to remove its lis pendens from Charlene's Pou Road property and accept the other

_____

[2] Charlene Lewis was not named in the criminal charges filed against her parents and some other members of her family.

3

described assets as full and complete satisfaction of the forfeiture allegations of Count Three of the final Bill of Information (Doc. 81), in exchange for their agreement to release all interests in the other described assets, as follows:

> "After transfer of all property listed in the Consent to Forfeiture and after sentencing of Defendant, the United States Attorney agrees to remove the lis pendens filed October 23, 1995, and placed on the records of Rapides Parish concerning the house located at municipal address of 81 Pou Road, Elmer, LA 71424 and titled in the name of Charlene Lewis."

In 1996, at the joint plea hearing, the prosecutor advised the court that the consent decree of forfeiture was related to and could be considered in the restitution order (Doc. 297-2; March 13, 1996 transcript of plea hearing, p. 9).  Connie and Patsy Lewis then entered guilty pleas pursuant to their plea agreements and Charlene's property at 81 Pou Road was released (Doc. 86).

The government obtained an order of restitution against all of the co-defendants in the criminal case (Connie Lewis, Patsy Lewis, Carson Lewis, Jason Lewis, Marion Richey) jointly and severally,[3] for a total of $4,005,399.00 (Docs. 105, 111, 116, 121, 120, 125).

In 2011, the government conducted new judgment debtor exams of Connie and Patsy Lewis and deposed Charlene Lewis Slater concerning the property she no longer owned at 81 Pou Road.  From those proceedings, the government filed a writ of execution against

---

[3] It appears that Jason Lewis' liability for the restitution was limited to $1,715,163.00 and Marion Richey's liability for restitution was limited to $414,947.00 (Docs. 120, 125).

Charlene Lewis Slater's home at 47 Ashton Road in Boyce, Louisiana, alleging Charlene used the proceeds of the sale of the property at 81 Pou Road, of which the government alleges she was only the nominee owner for her parents, to purchase the property at 47 Ashton Road, of which she is, the government again claims, only the nominee owner for her parents.  The government contends that Connie and Patsy Lewis transferred the title to the property at 81 Pou Road to their daughter, Charlene Lewis (Slater), in 1989 in order to protect that property from creditors (Doc. 286, p. 7/11), and that Charlene subsequently purchased and improved the property at 47 Ashton Road with the proceeds of the sale of the Pou Road property.  The government further contends that it is entitled to seize the property at 47 Ashton Road, in partial satisfaction of the Connie and Patsy Lewis' restitution debt to the government, because it arguably was purchased partly with proceeds of the sale of the property at 81 Pou Road.

The Pou Road property was sold by the Connie and Patsy Lewis to Charlene in 1989, before they were charged with and convicted of food stamp fraud.  As will be explained, Charlene divided, improved and sold the property at Pou Road, and the proceeds from those sales were used, along with mortgage loans Charlene made, to purchase other property on Cotile Lake Road, which was improved and sold, and Ashton Road, which was divided, improved, and sold in part; ultimately, Charlene used part of the proceeds of those sales

to build the house at 47 Ashton Road, which is titled in her name but occupied by her parents, Connie and Patsy Lewis.

Connie Lewis, Patsy Lewis and Charlene Lewis Slater contend the property at 47 Ashton Road belongs to Charlene, as the title owner of record, and that the government's attempt to seize the property violates Connie's and Patsy's 1996 plea agreements.

The discussion herein focuses on (1) the plea agreements, (2) the statute of limitations, and (3) nominee ownership.

<u>Burden of Proof</u>

The FDCPA provides that, on written application of counsel for the United States, a court may issue a writ of execution against property in which the judgment debtor has a substantial nonexempt interest, as set forth in 28 U.S.C. § 3203.  The government's burden of proof is set forth in 18 U.S.C. § 3613A(a)(1), which states in part that, upon a finding that the defendant is in default on a payment of a fine or restitution, the court may order the sale of property of the defendant.  The factors the court must consider are set forth in Section 3613A(a)(2), which provides that, in determining what action to take, the court shall consider the defendant's employment status, earning ability, financial resources, the willfulness in failing to comply with the fine or restitution order, and any other circumstances that may have a bearing on the defendant's ability or failure to comply with the order of restitution.

<u>Law and Analysis</u>

As a preliminary matter, I note that the Government's application for writ of execution sets forth incorrect amounts of restitution owed by Connie and Patsy Lewis.  According to the presentence reports[4] and the sentencing transcripts, the total amount of loss suffered by the Department of Agriculture and attributable to the coconspirators was $4,005,399.  Connie, Patsy and Carson Lewis were all held liable, jointly and severally, for the entire amount of loss.  However, due to the fact that Jason Lewis and Marion Richey did not enter the conspiracy until later, Jason Lewis was only held liable for up to $1,715,163 of the total loss amount, jointly and severally with the other co-defendants, and Marion Richey was only held liable for $414,947 of the total loss amount, jointly and severally with his co-conspirators (see Docs. 120, 125; Tr.-Hearing of June 11, 1996).

Counsel for the Government erred in calculating the balance of restitution owed by Connie and Patsy Lewis, apparently by failing to acknowledge the joint and several liabilities of the defendants. In other words, it does not appear that Connie and Patsy Lewis were given credit for the amounts paid on the restitution debt by their co-defendants.[5]

---

[4] Presentence reports are available through the U.S. Probation Office.

[5] Pursuant to the government's calculations, the government would recover the entire amount of restitution from each of three

The Government stated, in the application for writ of execution, that Connie and Patsy Lewis had been ordered to pay restitution of $4,005,399, and that Connie still owed $4,004,467.92 and Patsy still owed $3,994,628.81.  Since there is joint and several liability between all five defendants to varying degrees, and between Connie and Patsy to the same degree (or, for the entire amount), Connie and Patsy must each have the exact same outstanding balance owed for restitution.  Therefore, the amounts "owed" set forth in the application for writ of execution filed by the Government are clearly erroneous.

It is also noted that the Government failed to serve notice of the order for writ of execution on Charlene Slater as the record owner of the property at issue, as required by 28 U.S.C. § 3004(c) of the FDCPA and § 3203(g)(1)(A)(i)(IV) (Doc. 270).  However, Slater received notice of the proceeding through her parents and filed a request for a hearing as to her parents (Doc. 274), thereby making a general appearance in this case.

1. Plea Agreements

In 1996, the government reached written plea agreements with Connie and Patsy Lewis, part of which included an agreement by the government to release the lis pendens on Charlene Lewis' property at 81 Pou Road and not seize it as part of the criminal forfeiture

---

of the defendants, plus the limited amounts owed by two of the defendants, for a windfall recovery of about 250 percent above the amount of its actual loss.

count against the defendants.  The government followed through with its side of the bargain and removed the property at 81 Pou Road from the list of property to be forfeited.

Now, in 2012, the government (currently represented by a different Assistant United States Attorney now than it was in 1996) seeks to have the court consider (*but not declare*) the 1989 sale of the 81 Pou Road property by Connie and Patsy Lewis to Charlene Lewis Slater a simulation or a fraud.  The government contends that Connie and Patsy Lewis were the real owners of the Pou Road property because they never actually transferred the property to Charlene Lewis (now Slater).  The government further contends that it is entitled to seize the property at 47 Ashton Road, in partial satisfaction of the Connie and Patsy Lewis' restitution debt to the government, because it arguably was purchased partly with proceeds of the sale of the property at 81 Pou Road.  As will be explained, Charlene divided, improved and sold the property at Pou Road, and the proceeds from those sales were used, along with mortgage loans Charlene made, to purchase other property on Cotile Lake Road, which was improved and sold, and Ashton Road, which was divided, improved, and sold in part; ultimately, Charlene used part of the proceeds of those sales to build the house at 47 Ashton Road.  The property at 47 Ashton Road is titled in Charlene Lewis Slater's name, but occupied by Connie and Patsy Lewis.  The government argues that the proceeds of the sale of the Pou Road property,

including the house at 47 Ashton Road, are subject to seizure for restitution owed by Connie and Patsy Lewis.

The government further contends that the government's agreement to release its claim to the property at 81 Pou Road, in Connie and Patsy Lewis' plea agreements, was for the release of its forfeiture claim, and not the restitution claim.

If a defendant pleads guilty as part of a plea agreement, the Government must strictly adhere to the terms and conditions of its promises in the agreement. U.S. v. Elashyi, 554 F.3d 480, 501 (5th Cir. 2008), cert. den., 130 S.Ct. 57, 61, 363 (U.S. 2009), citing U.S. v. Munoz, 408 F.3d 222, 226 (5th Cir. 2005). When interpreting terms of a plea agreement, the court applies general principles of contract law. United States v. Cantu, 185 F.3d 298, 304 (5th Cir. 1999). Thus, a plea agreement is construed strictly against the Government as the drafter. Elashyi, 554 F.3d at 501, citing U.S. v. Somner, 127 F.3d 405, 408 (5th Cir. 1997). In order to assess whether a plea agreement has been violated, the court considers whether the government's conduct is consistent with the defendant's reasonable understanding of the agreement. Cantu, 185 F.3d at 304, quoting United States v. Valencia, 985 F.2d 758, 761 (5th Cir. 1993). The government is not permitted to breach its part of a plea agreement in such a way that frustrates the defendant's reasonable understanding of the agreement. United States v. Asset, 990 F.2d 208, 216 (5th Cir. 1993). The defendant bears the burden

10

to prove by a preponderance of the evidence the underlying factors that establish the breach.  Cantu, 185 F.3d at 304-05.

Connie Lewis' plea agreement (Doc. 84) states in paragraph 25:

"After transfer of all property listed in the Consent to Forfeiture and after sentencing of Defendant, the United States Attorney agrees to remove the lis pendens filed October 23, 1995, and placed in the records of Rapides Parish concerning the house located at the municipal address of 81 Pou Road, Elmer, La. 71424 and titled in the name of Charlene Lewis."

Patsy Lewis' plea agreement (Doc. 89) states substantially the same thing in paragraph 24.

The plea agreements also advised the defendants of the possibility that the court would order payment of restitution in addition to the other penalties (Doc. 84, para. 8; Doc. 89, para. 8):

"Defendant understands and agrees that in addition to the penalties set forth in the preceding paragraphs, the Court may order the Defendant to make restitution and that the amount of restitution and method of payment is in the discretion of the Court."

At the plea hearing held on March 13, 1996, when Connie Lewis entered his guilty pleas, the Assistant U.S. Attorney stated to the court that the consent decree of forfeiture (which included the government's agreement to release the Pou Road property) should be considered to be related to the restitution, also (Ex., March 13, 1996 transcript, page 9).  In response to the district judge's specific questions concerning restitution (Tr. p. 9), the prosecutor's (Gillespie's) response was:

```
Mr. Gillespie:  Yes,  sir,  there  will  be  a  possible
                restitution  order  by  the  Court  as  an
                option you have.
The Court:      And the consent decree of forfeiture, is
                that related to the restitution in some
                degree:
Mr. Gillespie:  Yes, sir.  You can consider that in the
                restitution order, yes, sir.
```

Connie  Lewis  testified  at  his  2011  deposition  that,  as  a
condition  of  his  plea  agreement,  he  agreed  to  give  the  government
his  newly-built  home  on  Cotile  Lake  in  exchange  for  their  agreement
to  leave  Charlene's  home  at  81  Pou  Road  alone  (Doc.  306,  p.  37).
Connie  testified  that  the  government  should  "forget"  trying  to  take
the  money  from  the  sale  of  Charlene's  house  on  Pou  Road  because  it
had  agreed  to  leave  her  house  alone  (Doc.  306,  p.  38).   Connie
testified  that  he  built  the  house  on  Pou  Road  for  Charlene,  not  for
himself  and  Patsy  (Doc.  306,  p.  38).

Patsy  testified  at  her  2011  deposition  that  Connie  had  made  a
plea  agreement  with  the  government  in  which  the  government  agreed
to  release  the  Pou  Road  house  because  it  was  Charlene's  house,  not
theirs  (Doc.  308,  pp.  39-43).

The  defendants'  understanding  of  their  plea  agreements  is  that
the  government  released  *all*  claims  against  the  property  at  81  Pou
Road.   While  the  plea  agreements  did  not  expressly  use  the  word
"restitution,"  in  light  of  the  prosecutor's  statement  when  directly
asked  by  the  district  judge,  it  is  clear  that  the  government  was
releasing  all  claims  to  the  Pou  Road  property.   To  suggest
otherwise  would  result  in  the  government  having  succeeded  in

12

tricking the Lewises into pleading guilty under the false pretense that the government would not take their daughter's property at Pou Road.[6]  Moreover, the defendants, in their effort to protect their daughter's home, would not have negotiated to protect it only from criminal forfeiture, only to leave it vulnerable to seizure for their restitution obligation.

Finally, the government did not attempt to seize the Pou Road property in satisfaction of the Connie's and Patsy's restitution debt in 1996, when it seized and sold other properties in satisfaction of the defendants' debts when the facts and the government's promise was known to the prosecutor who handled the case, and did not place a lien on the property for the restitution owed (See Doc. 86).  Charlene Lewis sold the Pou Road property in 1999, unencumbered;  the government never attempted to seize Charlene's house on Pou Road in satisfaction of Connie's and Patsy's restitution debt before Charlene sold it in December 1999. The government's failure to perfect a lien against the Pou Road property and failure to attempt to seize that property for the restitution debt indicates the government intended to release any and all claims to it, including for payment of fines and

---

[6] Apparently, the government engaged in extensive negotiations with all defendants regarding their plea agreements and the property subject to seizure.  However, counsel for the government advises that the prosecuting attorney's files in this case, including any documents regarding those negotiations, have been destroyed.

restitution, and not just its claim for satisfaction of Connie's and Patsy's criminal forfeiture.

Therefore, the government's conduct now, in 2013, through a new Assistant U.S. Attorney not personally familiar with the government's promise sixteen years before (until the undersigned obtained the sentencing transcript and pointed it out), in attempting to seize the proceeds of the sale of the Pou Road property, is inconsistent with and frustrates Connie and Patsy Lewis' reasonable understanding of their 1996 plea agreements.

Therefore, since permitting the government to seize Slater's property would cause it to breach its plea agreement with Connie and Patsy Lewis, and its promise to release this property, the writ of execution should be denied on that ground.

Although this should be the end of the matter, for completeness, I will discuss the other issues presented.

2. Statute of Limitations

The government contends that Connie and Patsy Lewis fraudulently transferred the title of the property at 81 Pou Road to their daughter, Charlene, in 1989 in order to protect that property from creditors. The government further contends, without proof, that Charlene did not pay Connie and Patsy Lewis for the property, or did not pay a sum reasonably equivalent to the value

of the property.[7]  Therefore, the government contends that Connie

and Patsy Lewis were the real owners of the Pou Road property, and

that the government is entitled to seize Charlene's property at 47

Ashton Road in partial satisfaction of the defendant's restitution

debt to the government, because it believes it was purchased in

part with proceeds of the sale of the property at 81 Pou Road.[8]

However, the government states that it does not seek to have

_____

[7] The government has not adduced any financial records or
property appraisals.

[8] In other words, the government seeks to prove the sale of
the Pou Road lot by Connie and Patsy Lewis to their daughter,
Charlene, was simulated.  A simulated sale is one which, by
mutual agreement of the parties, does not result in the transfer
of property. Although such a sale is usually clothed in legal
formalities, it does not express the true intent of the parties.
La.C.C. art. 2025; Thompson v. Woods, 525 So.2d 174, 177-178 (La.
App. 3d Cir. 1988).  Also, Davis v. Parker, 145 F.3d 359, *9 (5th
Cir. 1998).  There are two types of simulations: absolute and
relative.
    In an absolute simulation, which is sometimes called a pure
simulation or non-transfer, the parties do not intend that their
contract have an effect between them.  La.C.C. art. 2026; Trident
Oil & Gas v. John O. Clay Exploration, Inc., 622 So.2d 1191, 1193
(La. App. 2d Cir. 1993).  A sale that appears to be valid on its
face, but is intended by the parties to be a gift rather than a
sale, is a relative simulation.  Trident Oil & Gas Corp., 622
So.2d at 1193.
    In order to determine whether or not a sale is simulated the
court must determine whether the parties acted in good faith,
whether there was an actual intention to transfer property, and
whether any consideration was given for the transfer.  Thompson,
525 So.2d at 177-178.  *A transaction will not be set aside as a
simulation if any consideration supports the transaction because
the reality of the transference is thus established.* Davis, 145
F.3d at *10, citing Trident Oil & Gas Corp., 622 So.2d at 1193.
Also, Russell v. Culpepper, 344 So.2d 1372 (La. 1977).
    Since the only evidence in this case shows Charlene Slater
paid her parents $5000 for the tract of land at 81 Pou Road, the
government cannot prove the sale was a simulation.

the sale of the Pou Road property to Charlene set aside as a
fraudulent conveyance because, it concedes, it is barred from doing
so by the statute of limitations, 28 U.S.C. § 3304(b),[9] and because
the property has since been purchased by a third party in good
faith, 28 U.S.C. § 3307(a).

The Pou Road property was sold by the Lewises to Charlene
Lewis in 1989, and the Lewises' debt to the United States arose in
the 1996 criminal judgment.   It is abundantly clear from the
criminal pleadings that the government was aware of the existence
of the property at 81 Pou Road in 1996.   Therefore, the very latest
date the government could have brought an action under Section 3304
was in 2002, or six years after the 1996 criminal judgment was
entered.

---

[9] Under 28 U.S.C. § 3304(b) of the Federal Debt Collection
Procedures Act, there is fraud where a property transfer occurs
prior to the date the debt was incurred (without regard to date
of judgment), under the following circumstances:
    (b)(1) Except as provided in section 3307, a transfer
made or obligation incurred by a debtor is fraudulent
as to a debt to the United States, *whether such debt
arises before or after the transfer is made or the
obligation is incurred*, if the debtor makes the
transfer or incurs the obligation--
    (A) with actual intent to hinder, delay, or defraud a
creditor; or
    (B) without receiving a reasonably equivalent value in
exchange for the transfer or obligation if the debtor-
       (i) was engaged or was about to engage in a
business or a transaction for which the remaining
assets of the debtor were unreasonably small in
relation to the business or transaction; or
       (ii) intended to incur, or believed or reasonably
should have believed that he would incur, debts beyond
his ability to pay as they became due.

Neither can the government pursue "other property of the transferee" (Slater) due to the statute of limitations.  28 U.S.C. § 3306(a)(2), (b)(3).  Therefore, the government is also barred from pursuing the property at 47 Ashton Road pursuant to a claim of fraud in the transfer of the property at 81 Pou Road.

Therefore, the government is barred by the statute of limitations from bringing any action arising from fraud in the transfer of the Pou Road property by Connie and Patsy Lewis to Charlene Lewis Slater.

## 3. The Nominee Ownership Theory

The government contends that Charlene Lewis Slater was the nominee owner of the Pou Road property and is the nominee owner of the property at 47 Ashton Road, and that Connie and Patsy Lewis are the true owners.  The government argues that the evidence establishing that Connie and Patsy Lewis are the true owners lies in their plea agreements, and in the circumstances indicating their ownership of the property at 47 Ashton Road.[10]

It is long settled in federal law that title to land can be acquired and lost only in the manner prescribed by the law of the place where such land is situated.  Munday, 252 U.S. at 503, 40 S.Ct. 365, citing U.S. v. Crosby, 7 Cranch 115, 116, 3 L.Ed. 287

---

[10] The government's third basis for arguing nominee ownership-fraudulent transfer-was disposed of above, in the Statute of Limitations section.  See also the discussion, infra, at pp. 20, 21-24 and 34-35.

(U.S. 1812).  Also, <u>Norton v. House of Mercy of New York</u>, 101 F. 382 (5th Cir. 1900) ("that to the law of the state in which the land is situated we must look for the rules which govern its descent, alienation, and transfer, and for the effect and construction of wills and other conveyances").

The application of state law is also found in the law as to restitution.  A restitution order is a lien in favor of the United States on all property and rights to property of the person fined *as if the liability of the person fined were* a liability for a tax assessed under the Internal Revenue Code of 1986; the lien arises on the entry of judgment and continues for 20 years or until extinguished.  18 U.S.C. § 3613.  Since the federal tax lien statute itself creates no property rights but merely attaches consequences, federally defined, to rights created under state law, the court must look initially to *state law* to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as property or rights to property within the compass of the federal tax lien legislation.  <u>United States v. Craft</u>, 535 U.S. 274, 278, 122 S.Ct. 1414 (2002); <u>May v. United States</u>, 2007 WL 3287513 (11th Cir. 2007), cert. den., 554 U.S. 904, 128 S.Ct. 2943 (2008).  Also, <u>Aquilino v. U.S.</u>, 383 U.S. 509, 80 S.Ct. 1277 (1960), and cases cited therein; <u>U.S. v. Yielding</u>, 657 F.3d 722 (8th Cir. 2011).  Title to land can be

acquired and lost only in the manner prescribed by the law of the place where such land is situated.  _Munday v. Wisconsin Trust Co._, 252 U.S. 499, 503, 40 S.Ct. 365 (1920).  Therefore, this court must look to the law of Louisiana to determine the true owner of the Pou Road and the Ashton Road property.  In Louisiana, title to real estate is evidenced in writing only.  _Mitchell v. Clark_, 448 So.2d 681, 685 (La. 1984).

The government contends that Charlene Slater held title to the property at 81 Pou Road, and currently holds title to the property at 46 Ashton Road, as the nominee for the true owners, Connie and Patsy Lewis.  A nominee is one who holds bare legal title to property for the benefit of another.  _Scoville v. United States_, 250 F.3d 1198, 1202 (8th Cir. 2001), cert. den., 534 U.S. 953, 122 S.Ct. 352 (2001), citing Black's Law Dictionary (7th ed. 1999); see also _United States v. Gilbert_, 244 F.3d 888, 902 n. 37 (11th Cir. 2001).

Whether property is held by a nominee is determined by reference to state law.  Louisiana  law provides a test for determining whether an entity is the nominee of another.  The term "nominee" has been defined by the jurisprudence of Louisiana as a "mandatary."  _Petrocana, Inc. v. William H. Kenny Consultants, Ltd._, 595 So.2d 384, 385 (La. App. 3d Cir. 1992), citing _Evergreen Plantation, Inc. v. Zunamon_, 291 So.2d 414 (La. App. 2nd Cir. 1974) ("Nominee is defined in Black's Law Dictionary (4th ed. 1957) as:

19

'...one designated to act for another as his representative in a rather limited sense.  It is used sometimes to signify an agent or trustee. It has no connotation, however, other than that of acting for another, in representation of another, or as the grantee of another.' ...Manifestly, the nominee is not really a third party but only an 'alter ego' of the original vendee and as such nominees he stands in the same position as the one he represents, the original vendee."). Under Louisiana law, a mandate to buy or sell immovable property must be in writing.  La.C.C. art. 2996, 2997; Sanders v. Rudd, 427 So.2d 1271, 1273-1274 (La. 2d Cir. 1983).

Parole evidence is admissible, however, to show that a sale did not take place, and that the property continues to belong to the pretended vendor.  Mitchell, 448 So.2d at 685.  Also, La.C.C. arts. 1848, 1849.  Although the government may introduce parol evidence to prove that the transfer of the Pou Road property by Connie and Patsy Lewis to Charlene Lewis (Slater) was a simulation, it is barred by the statute of limitations from proving a simulation, or fraud as discussed, supra, at pages 14-17.

Therefore, the government is limited, at this point, to trying to prove that Charlene is the nominee owner of the property at 47 Ashton Road by other evidence.

However, the government attempts to prove Slater is not the true owner of the property at 47 Ashton Road, or that Connie and Patsy Lewis have some ownership interest in the property at 47

Ashton Road, because the proceeds from the sale of the property at 81 Pou Road (which the government contends Connie and Patsy Lewis actually owned) went into the purchase and construction of the property at 47 Ashton Road.   In other words, the government is attempting to do indirectly what it is precluded from doing directly.   Although barred by the statute of limitations from proving fraud, the government is attempting to prove nominee ownership of the 47 Ashton Road property **1)** by relying on an alleged admission in the plea agreements by Connie and Patsy Lewis, **2)** alleged fraud in the ownership of the 81 Pou Road property, and **3)** by other facts that it contends prove that Slater is a mere nominee owner.

   <u>For the sake of completeness in addressing the government's motion for writ of execution, the government's arguments will be addressed without regard to the statute of limitations.</u>

The Evidence

   The government attached property documents to its writ application for writ of execution to Charlene Lewis Slater held the title to the Pou Road property, and currently holds the title to the 47 Ashton Road property, in her name as the nominee owner (mandatary) for her parents, Connie and Patsy Lewis (Doc. 271). Those documents, as well as the deposition testimony, show the following sequence of events:

   On **December 29, 1989,** Connie Lewis sold about 4 acres at
   81 Pou Road in Elmer, Louisiana to his daughter, Charlene

21

Lewis, for $5000 by authentic act filed in the Rapides Parish public records (Doc. 271, Ex. 3). Connie Lewis built a house on that property for Charlene with building materials he had stored, in return for which Connie and Patsy lived in the house *with Charlene* (Doc. 306, pp. 10/41, 19/41).

On **October 18, 1995**, Connie and Patsy were charged by indictment with food stamp fraud (Doc. 1).

On **March 13, 1996**, Connie and Patsy entered guilty pleas to charges relating to food stamp fraud (March 13, 1996 hearing transcript).

On **December 28, 1999**, Charlene Lewis sold the house and about 3 acres of the property at 81 Pou Road for $200,000 (Doc. 271, Ex. 7; Doc. 306, p. 8/41; Doc. 307, p. 14/36).

On **January 8, 2000**, Charlene Lewis purchased 8.175 acres at 49 Ashton Road for $35,000 (with proceeds from the sale of the house and 3 acres on Pou Road), and Connie and her brothers built a house there (first Ashton Road house) (Doc. 271, Ex. 9; Doc. 307, pp. 15-16/36; Doc. 308, p. 22).

On **June 29, 2001**, Charlene Lewis borrowed $70,800 from a bank, placing a mortgage on the 8.175 acres on Ashton Road, to complete the first house on Ashton Road (Doc. 271, Ex. 10; Doc. 307, p. 17/36). Connie Lewis built a house at 49 Ashton Road for Charlene, in exchange for which Connie and Patsy lived there *with Charlene* (Doc. 306, p. 16/41).

On **July 2, 2001**, Charlene Lewis purchased 2.725 acres at 100 Cotile Lake Road for $9,655 (Doc. 271, Ex. 13; Doc. 307, p. 11).

On **April 10, 2002**, Charlene Lewis borrowed $105,000 from a bank, mortgaging the property at 49 Ashton Rd, to build spec homes at 47 Ashton Road and 100 Cotile Lake Road (Doc. 271, Ex. 12; Doc. 306, pp. 17/41, 26/41; Doc. 308, p. 11). Connie Lewis built the spec homes for Charlene (Doc. 306, pp. 12-14/41, 17/41). Charlene and her parents never lived in the Cotile Lake Road house (Doc. 306, p. 17/41).

On **May 23, 2003**, Charlene Lewis sold the house and 2.72 acres at 100 Cotile Lake Road for $110,000 (Doc. 271, Ex.

13; Doc. 306, Tr. pp. 13-14/41, 23/41). Charlene used the proceeds of that sale to pay off other loans and, later, help build a house at 47 Ashton Road (Doc. 306, p. 18/41; Doc. 307, p. 18/36; Doc. 308, p. 13).

On **August 5, 2004,** Charlene Lewis sold the remainder of the property at 81 Pou Road (with a house which Connie had built for Charlene) for $100,000 and used the money to pay off the mortgage (Doc. 271, Ex. 14; Doc. 306, pp. 11/41, 23/41; Doc. 308, p. 14).

On **January 6, 2006,** Charlene Lewis sold 1.97 acres with a home at 49 Ashton Road for $285,000 (Doc. 271, Ex. 11; Doc. 306, pp. 14-15/41, 25/41) and paid off the mortgage on it (Doc. 306, p. 25; Doc. 307, p. 26).

In **2006,** Charlene sold 1.21 acres of the Ashton Road property to an adjoining landowner for $4000; that property provided the neighbor access to the lake (Doc. 306, pp. 28-29/41; Doc. 307, p. 21/36; Doc. 308, pp. 19-20).

**After 2006,** Connie built a house at 47 Ashton Road with part of the proceeds from the sale of the home at 49 Ashton Road (Doc. 306, p. 25-26/41, 30/41; Doc. 307, pp. 26-27/36). Connie and Patsy lived at 47 Ashton Road rent-free in exchange for Connie having built the house for Charlene (Doc. 306, p. 30/41). This is the home the government seeks to seize.

For completeness, the deposition and hearing testimony is summarized below.

According to Connie Lewis' 2011 deposition, he sold the Pou Road property to Charlene, built a house on it for Charlene (his occupation was as a builder at that time), and he, Patsy, and Charlene lived in the house (Doc. 306, Tr. pp. 4-5/41). Patsy Lewis testified that she and Connie sold 4.09 acres at 81 Pou Road, Elmer, Louisiana, to Charlene for $5000 in 1989 (Doc. 308, p. 6). Charlene testified at her deposition in 2011 that she borrowed

$5000 to purchase the property at 81 Pou Road from her parents in 1989 (Doc. 307, Tr. pp. 13-14/36). Prior to then, Connie and Patsy had a trailer on the property (Doc. 306, Tr. p. 6/41). Patsy testified at the 2013 hearing that she co-signed a loan for Charlene to borrow the $5000 from Louisiana Savings & Loan (which no longer exists), and Charlene repaid the loan (Doc. 316, p. 28). [11]

Patsy testified at her deposition that, after the sale, Patsy and Connie continued to live there at Pou Road, and that Charlene was living with them (Doc. 308, p. 6).

Connie admitted at his deposition in 2011 that he was injured at work and became involved in a lawsuit in 1989, and was afraid the other party could take his property if he won; however, that turned out to be incorrect and, in any event, Connie did not lose the lawsuit (Doc. 306, Tr. p. 6/41). Connie stated that he sold the Pou Road property to Charlene because of the lawsuit and because he wanted to build her a house (Doc. 306, Tr. pp. 6-7/41). Connie said he did not buy the property back from Charlene, after the lawsuit was concluded, because he did not want to (Doc. 306, Tr. p. 8/41). Charlene testified that her parents sold the Pou Road property to her because she was unmarried, and because of the pending lawsuit (Doc. 307, p. 33/36). Patsy testified that Connie

---

[11] Patsy further testified that the government had the loan papers from Louisiana Savings & Loan in 1995/1996 (Doc. 316, p. 28), but the prosecutor stated that the government had since destroyed its files (Doc. 316, p. 20).

had gotten hurt and could not work, and they were afraid that, at some point in the future, they would not be able to meet their obligations, so they sold the property to Charlene to protect it from possible future creditors (Doc. 308, p. 6). Patsy further testified that they wanted the home to be in Charlene's name because they did not think she would ever marry and they wanted to make sure she was provided for in case something happened to them (Doc. 308, p. 52).

Connie further testified at his deposition that Charlene borrowed the money to build the first house on Pou Road house (Doc. 302, Tr. p. 11/41), and Connie built the house as a spec house for Charlene (Doc. 306, Tr. p. 11/41). Connie testified that he then sold the trailer, and he and Patsy moved into the Pou Road house with Charlene (Doc. 302, Tr. p. 8/41); Connie and Patsy did not pay any rent to Charlene (Doc. 306, Tr. p. 8/41). Connie testified that he used building materials he had accumulated over many years in Charlene's house (Doc. 306, Tr. pp. 6/41, 10/41). Patsy testified that Charlene did not have the money to build the first Pou Road house, so Connie (who had a full time job) built it very slowly (Doc. 308, p. 43). Patsy testified that they all lived at 81 Pou Road until Patsy and Connie were arrested (Doc. 308, p. 7). Patsy also testified that the sale of the Pou Road property to Charlene was the only time they sold property to pay bills and protect the property from future creditors; at the time they sold

25

the property to Charlene, they did not have any unusual outstanding bills (Doc. 308, pp. 8, 39).

Connie also explained that he built houses for Charlene for no charge on the understanding that he and Patsy would make their home with her (Doc. 306, p. 10/41). Patsy testified that Connie supervised the building of the houses and helped build them, then they lived in the houses with Charlene because they did not have a place to live (Doc. 308, p. 16).

After Connie and Patsy were imprisoned, Charlene apparently rented the house to people who did not take care of it, so Connie suggested she sell it (Doc. 306, p. 19/41). Connie further testified that, in about 1999, Charlene sold the house with 3 of the 4 acres at 81 Pou Road for $200,000 (Doc. 302, Tr. p. 8/41). Charlene testified at her 2011 deposition that, when she sold the house and 3 acres on Pou Road in 1999, she did not have a mortgage to pay off (Doc. 307, p. 14/36).

Patsy testified that Charlene wanted to buy land and build houses to make money (Doc. 308, pp. 45-46). Connie stated that he showed Charlene how to "flip" houses and his wife, Patsy, showed Charlene how to purchase property (Doc. 306, pp. 22-23/41; Doc. 307, p. 18/36). Charlene explained that Connie was in charge of building the houses, but she did not pay Connie for his work (Doc. 307, p. 21/36). Charlene testified that her mother kept her books for her, keeping track of her income and expenditures in building

26

and selling the houses (Doc. 307, p. 27/36).  Charlene testified that she looked at the books about once a month,[12] and wrote checks for the building expenses out of an account she had set up for that purpose (Doc. 307, pp. 27-28/36).  Charlene also testified that her mother, Patsy, sometimes acted as her agent; Charlene and Patsy both testified that Patsy attended the closing on the 100 Cotile Lake Road house as Charlene's agent and sometimes signed checks as Charlene's agent (Doc. 307, pp. 18-29/36; Doc. 308, p. 12). Charlene testified that her father, Connie, supervised the building of her houses and her mother kept her books and acted as her agent, but Charlene knew details of the various transactions (Doc. 307, p. 29/36).  Patsy testified that she wrote checks and kept up with the building materials (Doc. 3008, p. 47).  Patsy also testified that, if it had not been for Connie building Charlene's houses, Charlene would not have been able to build them so cheaply (Doc. 308, p. 50).

Charlene testified that she used the proceeds of the sale of the Pou Road property to buy 8.175 acres on Ashton Road and build a house there; her dad and her brothers built the house (Doc. 307, pp. 15-16/36).  Charlene testified she also borrowed $60,000 to complete that house, then borrowed $100,000 to build two spec houses-one on Pou Road and one on Cotile Lake Road (Doc. 307, p.

---

[12] Charlene later testified that she inspected the ledger on her first house, the first one built on Pou Road, every few months (Doc. 307, p. 34/36).

16/36).   Charlene's father and brothers built all three houses (Doc. 307, p. 17/36).   Connie testified he built a spec house for Charlene on Pou Road (the second Pou Road house) and she sold it with the remaining acre to another buyer for $100,000 in 2004 (Doc. 302, Tr. pp. 6/41, 11/41).   Patsy testified that, when Charlene sold the second Pou Road home (on one acre), Charlene helped her parents by paying some of their bills (Doc. 308, p. 14).   Connie and Patsy both testified that they did not receive any of the $300,000 from the sale of Charlene's Pou Road properties (Doc. 302, pp. 11-13/36; Doc. 308, pp. 8-9).

Connie, Patsy, and Charlene picked out the Cotile Lake Dr. property together, to build a spec home on (Doc. 306, p. 22/41); Charlene purchased land at 100 Cotile Lake Dr. for $9655 (Doc. 302, Tr. pp. 11-13/41).   Connie testified Charlene then borrowed $70,800 from a bank in 2001 and Connie built a house for her on the Cotile Lake Dr. property with that money (Doc. 302, Tr. pp. 13-14/41).   In 2003, Charlene sold the Cotile Lake Dr. property for $110,000 (Doc. 302, Tr. pp. 13-14/41).   Patsy testified that neither she nor Connie received any of the proceeds of the sale of the Cotile Lake Dr. property; instead, the proceeds went to pay off the $70,800 loan at the bank (Doc. 308, p. 12).   Charlene testified that she did not really make any money on the Cotile Lake Dr. house because it took over one year to sell it (Doc. 308, pp. 18-19).

Connie testified that Patsy helped Charlene pick out the

28

Ashton Road property before Connie was released from prison, but she actually purchased the property soon after Connie was released (Doc. 306, p. 23/41).   Connie testified that, after he was released, the three of them decided to build a house on the Ashton Road property for them to live in (the house at 49 Ashton Road); Charlene lived in it a little while, then moved into a place of her own (Doc. 306, Tr. pp. 24-25/41).  Connie testified that he did not pay monetary rent to Charlene, but gave her his building skills and labor instead (Doc. 306, Tr. p. 25/41).

Patsy testified they moved into the first house at 49 Ashton Road, but Charlene wanted to live closer to work, so she got an apartment in town and initially stayed in both the house and her apartment, but eventually moved full time into her apartment (Doc. 308, p. 17), and later married in 2009 (Doc. 306, Tr. pp. 24-26/41).   Charlene testified that the Ashton Road house was not on the market, but the buyer approached them and made an offer, so she sold it (Doc. 307, p. 20/36).  Patsy explained that the new owners of the 49 Ashton Road house allowed Connie and Patsy to remain in the house for three months after it was sold, until they could move into the house at 47 Ashton Road (Doc. 308, p. 18).  After Charlene sold the house at49 Ashton Road, she used the proceeds from the sale to pay off loans and the mortgage, then she built a second house on the property at Ashton Road, at 47 Ashton Road; Connie supervised building that house, also (Doc. 307, pp. 20-21/36).

Charlene testified she did not make much money on the house at 49 Ashton Road (Doc. 307, pp. 19/36, 26/36), but she made enough to pay off the mortgage on it, buy a $10,000 car for her mother, pay a few bills, and invest the rest in the next house (47 Ashton Road) (Doc. 307, p. 27/36).

Connie testified that, after Charlene sold the home at 49 Ashton Road in 2006, he built another house for her at 47 Ashton Road which Connie and Patsy currently live in; Charlene never lived in that house (Doc. 306, p. 26/41). Patsy testified that the arrangement is for she and Connie to live in Charlene's house as long as they need to and are able to maintain it (since there is nothing owed on it), until they have to go into a nursing home (Doc. 308, p. 17). Connie explained that the house is Charlene's because she paid for it and it is titled in her name (Doc. 306, pp. 26-27/41). Connie further testified there was no reason for him to own a home because it would not be long before he would have to live in a nursing home (Doc. 306, p. 26/41). Patsy testified that her name was on the building permit for 47 Ashton Road because she had obtained the building permits; Connie built the house and Charlene financed the construction (Doc. 308, pp. 20-21).

Charlene further testified that her parents currently live in her house at 47 Ashton Road and she does not charge them rent because they are her parents (Doc. 307, p. 22/36). Charlene testified that the house at 47 Ashton Road is her house because it

is titled in her name and she paid for it (Doc. 307, p. 22/36). Charlene testified that she does not have a key to the house, and she does not pay the bills (utilities) or make repairs to the house; her dad makes all of the repairs (Doc. 307, pp. 22-24/36).

Patsy testified that she and Connie do not pay rent or the mortgage on the house at 47 Ashton Road (Doc. 308, p. 26). Patsy testified that Connie makes whatever repairs need to be made for free (unless something is too expensive), and they pay their utility bills (though they do not run the air conditioner much due to cost), car insurance, and gasoline; Charlene does not pay any of their personal bills (Doc. 308, Tr. pp. 26-27). Patsy testified that the agreement is that the house belongs to Charlene; if anything happens to she and Connie, Charlene can dispose of the house as she pleases (Doc. 308, Tr. p. 27).

Finally, Connie testified that the money he obtained through food stamp fraud (at the Lewis meat market) was spent on business ventures-a slaughter house in Natchitoches and a meat processing plant which had several employees as well as overhead (Doc. 306, p. 34/41); Patsy testified to the same thing (Doc. 308, pp. 22-23/55). Connie testified that he did not give much money to his children, and did not give any to Charlene since she was working (Doc. 306, p. 35/41). Patsy also testified they did not give any money to Charlene and that Charlene did not know anything about the food stamp activities that were going on (Doc. 308, pp. 23-24).

31

Connie testified that his sole income, currently, is $644 per month in social security (Doc. 306, p. 31/41).  Patsy testified that her only income, currently, is $303 per month social security (retirement) and $84 per month in social security supplemental security income ("SSI") (Doc. 308, pp. 3-4, 25).

Patsy also testified that the Pou Road property became Charlene's in 1989, before she and Connie had a judgment for restitution against them, and that the subsequent houses were Charlene's because she borrowed the money for them and paid for them (Doc. 308, p. 54).  Charlene also testified, at her 2011 deposition, that her father had not transferred any of his money or assets to her in the last six years (Doc. 307, p. 29/36), and she was not aware of him transferring any property or money to anyone else (Doc. 307, p. 31/36).

Charlene testified that she visits her parents at their house about once a month (Doc. 307, p. 23/36).  Charlene testified that she assumed the house at 47 Ashton Road has had a termite inspection, but that she did not arrange it or pay for it (Doc. 307, p. 31/36).  Charlene testified that her parents pay the annual property taxes on the house because they are living there (Doc. 307, pp. 23-24/36).  Charlene further testified that she does not have homeowner's insurance on the house and does not know whether her parents have renter's insurance (Doc. 307, p. 24/36).

Charlene testified that, when she has her tax returns filled

out by an accountant every year, she does not claim rental income because her parents do not pay rent (Doc. 307, pp. 34-35/36). Charlene testified that she does not currently have a mortgage on the Ashton Road house (Doc. 307, p. 35/36).

Charlene testified that she is no longer building spec homes and that her father is unable to build houses anymore (Doc. 307, p. 30/36). Charlene testified that she thought her parents only have social security income and did not know any details of their finances (Doc. 307, p. 30/36). Charlene testified that her parents would live in the house at 47 Ashton Road until they were no longer able to, then they would move into a nursing home (Doc. 307, p. 31/36).

The Government's Arguments

**1) Admission**-The government contends that Connie and Patsy Lewis admitted they were the true owners of the property at 81 Pou Road in their 1996 plea agreements. The language the government refers to in Connie Lewis' plea agreement (Doc. 84) is in the Section entitled "*Consent to Forfeiture*": "*18. Defendant further admits that this property may have been titled or placed in the name of another party to conceal the true ownership of the property and rights, but that he is the true owner.*" Patsy Lewis' plea agreement (Doc. 89) contains the same paragraph (Par. 18) in the "Consent to Forfeiture" section of her agreement.

The provision in Paragraph 18 dealt with a long list of

properties, and did not conclusively establish that any of the forfeited property owned by Connie and Patsy Lewis was titled in someone else's name.  Instead, the modifier "may" created only a possibility.  The government simply has nothing to rely on in this sentence, insofar as it is attempting to prove the Lewises were the true owners of the property at 81 Pou Road.  Second, since the property at 81 Pou Road was not included in the plea agreements and forfeitures, the sentence in Paragraph 18 is inapplicable to the Pou Road property.

Therefore, the plea agreements do not prove, or even imply, that Patsy and Connie Lewis were the true owners of the Pou Road property.

2) **Fraud**-The government's claims based on a fraudulent transfer are barred by the statute of limitations, as discussed supra at pages 15-17.

3) **The government's other arguments-**The government argues that Charlene did not pay a reasonable amount for the 4.09 acres on Pou Road in 1989, which it alleges was worth more than $5000 in 1989. However, the government conceded at the 2013 supplemental hearing that it did not have any evidence to establish the tract's value (Doc. 316).  The only evidence of its value is from the testimony of the Connie and Patsy Lewis and Charlene Lewis Slater, and from the cash sale deed in evidence-and that unrefuted evidence

indicates the tract was worth $5000 in 1989.[13]   The government produced no appraisal, expert testimony, or other evidence of its value, but asks the court to assume that the property was worth more than $5000.  Therefore, the government has failed to show that Slater did not pay a reasonable amount for the property at 81 Pou Road.  In any event, as discussed supra at pp. 14-17, any claim as to a fraudulent transfer is barred by the statute of limitations.

The government also contends the property at Pou Road was actually Connie and Patsy's property because Charlene did not pay to have the house built on it.  However, Connie testified he gave Charlene the building materials he had accumulated over several years to build the house and donated his labor in exchange for Charlene allowing Connie and Patsy to live with her in the house rent-free.  Patsy testified that the house was built very slowly because they could not afford to buy all of the building materials at once and because Connie had a full time job, and that the arrangement was for she and Connie to live in the house with Charlene.  Therefore, Charlene and her parents had an arrangement whereby defendants exchanged their services in the construction of

---

[13] It is also noted that, under 28 U.S.C. § 3307(c) of the Federal Debt Collection Practices Act, the government could only have recovered judgment for the value of the asset transferred, or the value of the $5000 tract of land on Pou Road.  While the Government has consistently maintained that is cannot prove the value of land transferred, the testimony and bill of sale show it was transferred for $5000.  Therefore, without evidence to prove the Pou Road land was worth more than $5000, the government could only recover $5000 from the proceeds of the transfer of the Pou Road property by Connie and Patsy Lewis to Charlene Lewis Slater.

Charlene's house in return for a place to live with Charlene in that home.  Since consideration was exchanged on both sides, this arrangement did not give Connie and Patsy Lewis an ownership interest in Charlene's property at Pou Road.

The government next alleges that Connie and Patsy Lewis maintain exclusive dominion over the last house they built for Charlene, at 47 Ashton Road, without paying rent to Charlene. Defendants admit they live in their daughter's house at 47 Ashton Road, while their daughter lives elsewhere with her husband.  The evidence shows that defendants pay for their own living expenses, do basic maintenance on the home when they can afford it, and pay the annual property taxes, but do not pay a monthly rent to Charlene.  The defendants steadfastly maintain that the home is Charlene's, the defendants sold the original Pou Road property to Charlene and built a house on it so she would be provided for in the event something happened to them since she was unmarried (until 2010), and the proceeds of the subsequent sale of the Pou Road property went to Charlene to reinvest in property because it was always the defendants' intent that Charlene should have that property.

Moreover, Louisiana law provides a natural obligation for children to assist their parents, in La.C.C. art. 229, as follows:

> Children are bound to maintain their father and mother and other ascendants, who are in need, and the relatives in the direct ascending line are likewise bound to maintain their needy descendants, this obligation being

36

reciprocal.  This  reciprocal  obligation  is  limited  to
life's  basic  necessities  of  food,  clothing,  shelter,  and
health  care,  and  arises  only  upon  proof  of  inability  to
obtain  these  necessities  by  other  means  or  from  other
sources.

This  court  has  noted  that  Connie  and  Patsy  Lewis  have  very
limited fixed incomes (see financial affidavits at Docs. 180, 184).
Therefore,  by  allowing  her  parents  to  live  in  her  house  at  47
Ashton  Road,  rent  free,  Charlene  Lewis  Slater  is  fulfilling  her
natural  obligation  to  provide  shelter  for  her  parents  who  are  in
need.  The  fact  that  Connie  and  Patsy  Lewis  occupy  their  daughter's
home  at  47  Ashton  Road,  rent-free,  is  not  proof  that  they  are  the
true  owners  of  that  property.

The  last  property  in  a  string  of  property  transactions  that
began  with  Pou  Road  is  at  47  Ashton  Road,  which  is  titled  in
Charlene's  name  and  occupied  rent-free  by  Charlene's  parents,  in
accordance  with  their  long-standing  agreement.   The  home  at  47
Ashton  Road  is  on  property  that  Charlene  bought  and  was  built  with
money  from  her  previous  property  sales  and  mortgage  loans  she  made
at  the  bank  and  repaid,  and  is  titled  in  Charlene's  name.

The  government  has  not  adduced  any  written  evidence  to  show
that  Patsy  and  Connie  Lewis  conferred  the  power  of  mandate  (or
agency  or  nominee  status)  on  Charlene  Lewis,  for  her  to  hold  the
title  to  the  Pou  Road  property,  or  any  other  property,  in  her  name
on  their  behalf,  or  to  show  that  Connie  and  Patsy  Lewis  gave
Charlene  Lewis  Slater  written  authority  to  sell  the  Pou  Road

property, acquire the Ashton Road and Cotile Lake Road properties, or take out loans with mortgages on those properties as their agent. Simply put, the government has not adduced any evidence, written or otherwise, to prove Connie and Patsy Lewis were the actual owners of the property at 81 Pou Road, or are the actual owners of the property at 47 Ashton Road, and that Charlene Lewis Slater has acted as a mandatary (agent), or nominee owner, of those properties.

Therefore, the government is not entitled to seize Charlene Slater's house in satisfaction of her parents' restitution debt.

CONCLUSION

Based on the foregoing discussion, IT IS RECOMMENDED that the government's application for a writ of execution against Connie Lewis and Patsy Lewis, and against Charlene Slater's property at 47 Ashton Road in Boyce, Louisiana (Doc. 271), be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

38

A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 2nd day of May 2013.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE